**In the Interest of S.W., a Child.**

**S.W. and F.W., Parents, Appellants.**

**No. 90–764.**

Court of Appeals of Iowa.

Feb. 26, 1991.

William F. Denman, Des Moines, for parents-appellants.

Bonnie J. Campbell, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Charles K. Phillips, Asst. Atty. Gen., for appellee State.

Thomas J. McCann of Peddicord, Wharton, Thune, Foxhoven & Spencer, Des Moines, guardian ad litem for the child (appellee).

Heard by OXBERGER, C.J., and SCHLEGEL and SACKETT, JJ.

OXBERGER, Chief Judge.

The child in question, S.W., is a girl born in 1981. She suffers from a mental disability, and has been described as having an emotional age of four to five years.

The child lived with her parents until December 1987, when she was removed from her parents' home due to allegations of sexual abuse by her father. She was later adjudicated to be a child in need of assistance (CINA), and has been in foster care continuously since December 1987. Her present foster parents have expressed a willingness to keep her in their home until she reaches the age of eighteen. She seems to be doing very well in the foster home and appears to have become very attached to the foster family.

The father has never acknowledged sexual abuse of the child. However, in an earlier appeal, the Iowa Court of Appeals found by clear and convincing evidence the father sexually abused the child.

During most of the child's period of foster care, her parents have had weekly supervised visitation. The parents have been regular and consistent in exercising this visitation. The parents assert visitation has always gone well, but social workers note the child appears anxious during visitation.

During a review hearing in early 1990, the Department of Human Services (DHS) requested reduction of the parents' supervised visitation to once a month. The State noted the child appears anxious during visits and reduced visitation would give more consistency to the child's life.

The juvenile court granted the State's request and ordered the parents' visitation reduced to once a month. The juvenile court also confirmed prior orders and continued the child's CINA adjudication and foster care placement.

The parents have appealed the juvenile court order reducing their visitation. They contend weekly visitation benefited the child and should be continued. The parents also ask that the DHS be directed to start the process of returning the child to their home.

■ We review CINA proceedings de novo. *In re D.L.*, 401 N.W.2d 201, 202 (Iowa App.1986). We give weight to the fact findings of the juvenile court, but are not bound by them. Iowa R.App.P. 14(f)(7). We review the facts and the law and adjudicate rights anew while bearing in mind our paramount concern is the welfare and best interest of the child. *Id.* An interest exists in maintaining the family unit, but that interest is not absolute and may be forfeited by certain parental con-

duct. *In re N.H.*, 383 N.W.2d 570, 574 (Iowa 1986) (citation omitted).

The child is currently adjudicated to be a child in need of assistance pursuant to Iowa Code sections 232.2(6)(c)(2) and 232.-2(6)(d). Section 232.2(6)(d) involves children who have been sexually abused by a parent in whose home the child resides.

▇▇▇ The reduction in visits arises from a recommendation from Bruce Buchanan, the therapist working with the child and father. Mr. Buchanan also stated in his letter to DHS that long-term foster care was in the child's best interest. Mr. Buchanan bases these recommendations on his observation the child appeared anxious during the visit he witnessed with the parents and the father refuses to admit he sexually abused the child.

Throughout the entire time DHS has been involved with this child, her father has adamantly refused to admit he sexually abused her. Prior to therapy, he also refused to believe she had ever been abused, but now admits she has been sexually abused by someone.

Our review of the record indicates that other than refusing to admit the father sexually abused the child, the parents have cooperated in every way with the recommendations and requirements of DHS. The minor problems asserted by DHS seem to involve lack of communication between the workers and the parents. Both parents appear to be attempting to follow all the directions of DHS and not questioning the limits of the requirements, whereas DHS workers seemed to feel they need not "spell out" exactly what is expected.

One example of this lack of communication involves the parents' complaint about the smallness of the room in which they meet with their child. The parents assert the family must sit at a table in a small room without a window during their two hour visits. The visit supervisor stated the only time the parents met in a larger room they did not play on the floor with the child like other parents usually do. The parents asserted they were unaware they could get on the floor because they had been instructed not to touch the child or initiate any response from the child and they did not want to "break any rules." The supervisor responded she should not have to tell the parents everything they could do. Another example is DHS felt the parents did not express support to the child by telling her they cared for her. The parents testified they had been told not to show affection and they assumed that meant verbally as well as physically.

The overall picture we derive from our review of the record is of parents desperately trying to cooperate and not do anything wrong and DHS faulting them for the actions (or inactions) resulting from their timidity. Additionally, Mr. Buchanan testified much of the negative behavior involved in the relationship between the child and her father was "typical" of parents of children with disabilities. Further, both Mr. Buchanan and the father testified the father has gained insight into his domineering behavior towards his wife and the child. The father also testified he felt his therapy sessions helped him gain insight into his relationships with his wife and child.

The main indication used by Mr. Buchanan and DHS the weekly visits cause the child anxiety is the child jerks during the visits. The child currently takes medication to prevent seizures and her treating physician has reported he feels the jerking at least partially results from anxiety. No one disputes the child becomes anxious whenever she is placed in unusual circumstances and she does not tolerate change. The meeting in which Mr. Buchanan noted the child jerking occurred after she and her parents had been told people would observe the visit behind a one-way mirror. Additionally, unlike the usual visit situation, no supervisory person was present in the room with the family. Mr. Buchanan and DHS agreed the situation in itself could have caused the child anxiety but persist in pointing to the visit as support for decreasing the visits between the child and her parents.

The biggest problem seems to be that since the father refuses to admit he sexually abused her, his therapy cannot continue and therefore he has failed to meet the

permanency plan requirements. DHS denies giving up on reuniting the family, but admits the normal procedure is to reduce visitation when the department decides to permanently place a child in foster care. The impasse seems to be a direct result of the father's refusal to admit he sexually abused his daughter. The father continues to assert he did not sexually abuse his daughter.

We readily admit it is the child's best interest and not the father's best interest we are concerned with, but we do not feel reducing the visitation between the child and her parents is in her best interest. Everyone who testified at the hearing admitted the child remains bonded to her parents and appears to love her parents and her parents appear to love her. Everyone testifies the child is making great progress in school. Everyone testified the child appears to enjoy her visits with her parents and smiles and laughs during her visits. The negative aspects about the visits included she jerks for some unknown reason and once after the observed visit she asked if she had to visit with her parents. DHS reported she does not initiate hugs with her parents, but our review of her records indicate in earlier visits she did initiate hugs and kisses. DHS stated most children continue to ask about their parents and hug their parents but the responses did not seem geared toward what a disabled child normally would do.

Mr. Buchanan testified that usually a sexual abuse perpetrator must apologize to the victim before a positive relationship can be forged between the perpetrator and the victim. On further questioning, Mr. Buchanan did testify he was unsure if S.W. would even understand an apology, let alone benefit from it. Therefore, the goals of the child's therapy revolve around building her feelings of safety and security. Additionally, Mr. Buchanan stated this situation was atypical and did not fit within the treatment plan he had been taught.

We feel the parent-child relationship is an important one, and should not be severed because the individuals involved do not fit within the "normal" situation. Additionally, we do not believe parent-child visits should be decreased simply on vague interpretations of behavior. This child appears to be one who will always require supervision during her life and we are not prepared to easily "give up" the stability parents could provide. Without the stability and support of a family she may very well spend her life dependent on the State, and we are not prepared to allow that to happen without a clear showing that reducing visits with her parents is necessary. Especially in light of the fact the only complaint DHS has with the child's mother is she continues to believe in her husband's innocence.

There does not appear to be any ongoing abuse, and we feel DHS should continue to work with this family and continue to provide therapy geared toward strengthening the family as well as helping the child deal with her feelings of fear and insecurity. We find it important in this case to maintain and foster the parent-child relationship while working with the child. Sexual abuse does not appear to be a threat at this time and we feel confident that therapy can continue with the child and the father even if he continues to refuse to admit he sexually abused the child. Both parents have admirably cooperated with therapy and DHS, as well as expending great effort to remain active in their daughter's life, we see no reason to not believe they will continue to exhibit similar cooperation and efforts in the future. As DHS and Mr. Buchanan have testified, this is an atypical case, and we feel DHS should continue to work with this family even though it does not fit within any of the typical situations.

We reverse the juvenile court order decreasing parental visits and order weekly supervised parental visits. Additionally, we order DHS to continue providing therapeutic services to this family with the goal of maintaining the parent-child bond and attempting to reunite the family in accordance with this opinion.

REVERSED.